BEARD v. MILMINE et al.

(Circuit Court, N. D. Illinois, N. D. July 5, 1898.)

1. PRINCIPAL AND AGENT—EMBEZZLEMENT BY AGENT—BANKS—GAMING.

Brokers who receive from a bank president drafts of the bank in payment for his private losses in board of trade speculation, under circumstances charging them with notice that the drafts represent money embezzled from the bank, are liable to the bank for the proceeds of such drafts.

2. SAME—NOTICE.

Knowledge that their customer is president of the bank, that his purchases and sales are purely speculative, and that he has been steadily losing money in such speculations for 10 years, is. sufficient to charge the broker with notice that the drafts represent money embezzled from the bank.

At Law.

This was an action by John Beard, receiver of the First National Bank of Pella, against Edward C. Bodman and others, co-partners as Milmine, Bodman & Co.

The court, to whom the case was submitted without a jury, specially found the facts as follows:

First. The plaintiff was before and at the time of the commencement of this suit, and is now, the receiver, duly appointed by the comptroller of the currency, of the First National Bank of Pella. The plaintiff was, and at the time of the commencement of this suit is, a citizen of the state of Iowa. The said First National Bank of Pella is a national bank, organized under the banking laws of the United States in 1871, and is located at the town of Pella, in the state of Iowa.

Second. The defendants, George Milmine, Edward C. Bodman, Charles E. Milmine, Elliot H. Phelps, and Luther W. Bodman, are co-partners as Milmine, Bodman & Co., the said George Milmine, Edward C. Bodman, and Charles E. Milmine being residents and citizens of New York at the time of the commencement of this suit, and the said Elliot H. Phelps and Luther W. Bodman being, at the time of the commencement of this suit, residents and citizens of the city of Chicago, in the Northern district of Illinois, state of Illinois.

Third. The said First National Bank of Pella is situated at Pella, a town of about 3,000 inhabitants, in the midst of a farming community, and was organized in 1871, under the banking laws of the United States, with a capital stock of $50,000. E. R. Cassatt was the principal person engaged in its organization, and after the year 1883, together with his relatives, owned a majority of the stock, all of which was controlled by Cassatt. From the time of the organization of the bank to its failure, Cassatt was president and principal executive officer of the bank, and enjoyed in a high degree the confidence of its stockholders and of the people of Pella and of the surrounding territory. Subsequent to 1881 the management of the bank was entirely under the control of E. R. Cassatt. The board of directors performed their duties largely in a perfunctory manner, and their knowledge as to the affairs of the bank was derived almost exclusively from statements made to them by said Cassatt. Cassatt dictated the persons to whom loans should be made, and

had the entire discretion as to the acceptance of all bills receivable which became part of the assets of the bank. The method by which the affairs of the bank were conducted, the duties which the clerks performed, the manner of selling exchange, and the other executive methods of the bank were devised by said Cassatt, and carried on under his directions, without interference from the directors. The board of directors reposed implicit confidence in Cassatt, and accepted his statements as true in regard to all the affairs of the bank, and made no examination of the bills receivable to ascertain whether they were spurious or not. Cassatt had charge of the bills receivable of the bank and of the cash chest. Cassatt was accustomed, from the organization of the bank down to the time of its failure, to draw drafts on the funds of said bank on deposit in other banks, signing such drafts in the name of the bank by himself as president. The affairs of the bank were examined twice a year by the examiner appointed by the comptroller of the currency of the United States. At the times of such examinations Cassatt was accustomed to exhibit to the examiner the bills receivable and the cash on hand, and then return them to the safe. At such times the proper amount of cash was on hand, and such bills receivable as the books of the bank showed should be on hand. The balance of the stock, outside of Cassatt's holdings, was held in small amounts, the average being about $2,000 of stock, at its par value.

Fourth. The said First National Bank of Pella went into the hands of a receiver June 25, 1895. At the time of its failure it was, for the first time, ascertained by its stockholders, and by the other officers, that said Cassatt was a defaulter to the bank in the sum of about $65,000. Such sum had been taken by Cassatt, from time to time, from the moneys of the bank, and had been concealed by means of forged, spurious, and other fictitious notes, other evidences of loans having been put into the bank by said Cassatt. The forged and fictitious notes were so adroitly executed that there was nothing that would suggest to the ordinary observer that the notes were not genuine, as they purported to be. The said Cassatt has since that time been duly indicted, tried, and convicted for the embezzlement of said $65,000, and is now serving his sentence on account of such conviction.

Fifth. The said Cassatt began to have business dealings with the defendants, commission merchants on the board of trade, in the city of Chicago, in 1884, continuing to have such transactions down to and including a portion of the year 1894. Said dealings were substantially as follows: The said Cassatt would either personally or by wire direct the said defendants to purchase or sell certain futures in either wheat, oats, or provisions, which said direction would be executed by the defendants on the Chicago Board of Trade by buying of or selling to some other broker on such board the futures stipulated. Such purchases or sales would thereupon be carried by said defendants in the name of, and for the benefit of, said Cassatt, until another order was received by Cassatt, closing out the same, either by purchase or sale, as the case might be. Under the rules of the board of trade, the defendants would have been obliged to have delivered, in case of sales, or accepted, in case of purchases, from the brokers with whom they had transactions, the cereals or provisions in question, when the deals matured, and the said Cassatt would have been obliged to have taken or delivered to the defendants the cereals or provisions called for in such deals at the time when they would have matured. As a matter of fact, however, no consequential amount of the sales made by the defendants on account of Cassatt ever resulted in the delivery of any grain or provisions, and no consequential amount of any of the purchases made on his account ever resulted in obtaining, or the acceptance of, any grain or provisions. The deals were, in nearly every instance, closed before the future to which they related had arrived, and without the passing or intention to pass of any actual grain or provisions. All the transactions of Cassatt with the defendants were intended by him to be purely speculative transactions in futures on the board of trade, and were so understood by the defendants, and none of said transactions contemplated the purchase or sale of grain or provisions with any other purpose than the subsequent disposal of the same without the actual delivery or acceptance of the grain or provisions involved. The purchases and sales were numerous, frequently comprising several transactions in a day, and represented, in the aggregate,

a large amount of dealing. The defendants were protected from losses by margins put up, from time to time, with them by said Cassatt for that purpose. The general course of said speculation was unfavorable to Cassatt. He occasionally had some profits, but more frequently suffered losses. The money which was sent to Milmine, Bodman & Co. to pay the losses, aforesaid, was in turn paid out by Milmine, Bodman & Co. for the purpose of discharging the contracts made in behalf of Cassatt by them, upon which the losses occurred, and no profit resulted to Milmine, Bodman & Co. by reason of any of the dealings with Cassatt, except the commissions which they earned as brokers in negotiating the transactions for him. The whole course of the transactions would have disclosed to an ordinary observer, fully informed of the facts, that Cassatt was gradually losing, and that some funds. owned or controlled by him, must have been gradually eaten into by the losses, from time to time incurred, and the margins put up. The defendants themselves must have known this prior to and at the time they received the drafts sued upon, unless they willingly suffered themselves to be deceived.

Sixth. Said Cassatt, in order to carry on his deal with said defendants, kept two accounts in the said First National Bank of Pella, one in his own name and the other in the name of E. R. Cassatt & Co. During the period of said deals, Cassatt remitted to the defendants, on account of margins aforesaid, from time to time prior to the drafts sued on in these cases, twenty-seven drafts, each of which was exactly similar to the drafts sued on in this case; that is to say, each was signed, "First National Bank of Pella, by E. R. Cassatt, President." All of these drafts were collected by the defendants in the same way as the drafts in the suit. The earliest of the series of drafts prior to the drafts in suit was August 21, 1884, and the latest was April 6, 1891. Of these drafts, there were five in 1884, eight in 1885, six in 1886, two in 1887, one in 1888, two in 1889, one in 1890, and two in 1891, and were for the amounts and bore the dates as follows:

| 1884. | | 1885. | |
|---|---|---|---|
| August 21st | $  500 00 | January 5th | $  200 00 |
| October 11th | 300 00 | February 19th | 250 00 |
| November 19th | 300 00 | March 25th | 500 00 |
| December 1st | 500 00 | April 27th | 500 00 |
| December 9th | 300 00 | July 27th | 425 00 |
| **1886.** | | October 5th | 300 00 |
| April 12th | $1,000 00 | October 10th | 1,500 00 |
| April 17th | 1,000 00 | October 15th | 1,000 00 |
| May 14th | 500 00 | **1887.** | |
| September 11th | 300 00 | February 19th | $  300 00 |
| September 25th | 300 00 | July 8th | 300 00 |
| October 11th | 300 00 | **1888.** | |
| **1889.** | | December 3d | $1,000 00 |
| March 18th | $1,800 00 | **1890.** | |
| April 13th | 500 00 | February 13th | $  500 00 |
| | | **1891.** | |
| | | January 6th | $  500 00 |
| | | April 6th | 1,000 00 |

Each of said drafts was charged by the National Bank of Illinois to the First National Bank of Pella, and monthly statements were sent by the National Bank of Illinois to the First National Bank of Pella, which were checked up by the clerks in the latter bank, but during the two years immediately preceding the failure the checking was done by Cassatt himself. Most of the drafts sent by E. R. Cassatt, as aforesaid, both those prior to the ones in suit as well as the drafts sued upon in this case, except as hereinafter noted, were charged upon the books of the First National Bank of Pella either to the account of E. R. Cassatt, or to the account of E. R. Cassatt & Co., which account, at the time of such charging, had an apparent credit balance sufficient to pay or offset the charge so made against it. Such of said drafts as were not charged to E. R. Cassatt or to E. R. Cassatt & Co. were charged to some other account upon the books of said bank, which account, at the time of said charges, had an apparent credit balance sufficient to pay or offset the charges so made against it. Said drafts were all signed by E. R. Cassatt as president. The drafts sued on in this case were all drawn upon the National Bank of Illinois, payable to Milmine, Bodman & Co., and

signed, "First National Bank of Pella, by E. R. Cassatt, President," and were of dates and amounts as follows:

| 1891. | | 1892. | |
|---|---|---|---|
| August 20th | $1,400 00 | June 13th | $2,000 00 |
| August 31st | 800 00 | August 27th | 1,000 00 |
| September 19th | 500 00 | September 5th | 1,000 00 |
| **1893.** | | October 22d | 1,000 00 |
| January 30th | $1,000 00 | October 28th | 1,000 00 |
| February 14th | 600 00 | **1894.** | |
| February 18th | 1,500 00 | January 24th | $ 300 00 |
| March 13th | 600 00 | February 10th | 500 00 |
| June 21st | 2,500 00 | February 12th | 600 00 |
| November 23d | 300 00 | | |
| December 21st | 500 00 | | |

Seventh. None of the said drafts were used or intended to be used to pay off any debt or obligation of the said bank, but all were used to supply the margins in the private transactions of the said Cassatt with said defendants as aforesaid. Such transactions were kept secret from the bank by said Cassatt. The telegraphic correspondence between said Cassatt and the defendants was carried on in cipher. On one occasion the defendants failed to observe this cipher, and, on a protest from said Cassatt, promised that such oversight should not occur again. It is not unusual, however, for board of trade commission men to communicate with their customers in cipher. The cipher used in this case was the so-called "Robinson Cipher." Nearly every dealer in the country has a copy of this. The telegrams were neither signed nor addressed in cipher, but were addressed and signed by the correct names of the respective parties.

Eighth. There is no evidence from either side, other than the foregoing, tending to show that the said Cassatt was or was not a man of means, independently of his holdings in the said First National Bank of Pella. The defendants knew that Cassatt was president of the bank, and had access to its funds, but made no inquiry as to whether said Cassatt had means independently of his holdings in said bank, and made no inquiry of said Cassatt, the other officers of the bank, or any one else likely to know, whether said Cassatt was using his own means in the speculative transactions aforesaid, and no inquiry looking in that direction.

Ninth. The avails of the drafts sued upon in this case, through the means already described, were taken purposely by the said Cassatt, without authority of law, but as an act of theft and embezzlement, from the funds of said bank, and the defendants in receiving the avails of said drafts were, in fact, receiving the moneys stolen by said Cassatt from said bank. The court further finds that reasonable and prudent men, having no selfish interest to subserve, would have been led, by the facts in possession of the defendants, to suspect that said Cassatt might be unlawfully using the funds of the bank to supply the margins transmitted to the defendants, and especially so late as the margins transmitted by means of the drafts sued upon.

Hamline, Scott & Lord, for plaintiff.
Green, Robbins & Honore, for defendants.

GROSSCUP, District Judge. When, in violation of his right, an agent makes an appropriation of his principal's money, and turns it over to a third person, the principal may recover from the third person the money so appropriated, unless the third person is a bona fide holder for value and without notice. Under this rule, the plaintiff can, indisputably, recover from the defendants upon the facts found, unless the defendants are bona fide holders for value and without notice. The principal question, therefore, is whether the findings of fact show that the defendants are chargeable with notice of Cassatt's misappropriation.

Transactions in futures, of a purely speculative character, where nothing is put up, except for margins, are, in many essential results,

different from ordinary business transactions. There is, in these transactions, no investment of money in anything tangible,—in any property of supposedly equivalent value,—that remains when the deal is ended. If a trader in ordinary pursuits meets misfortune, or becomes involved, something usually remains of his investment. Unless his fortune be entirely swept away or he be dishonest, there is an estate. But the speculator, investing his money in margins, invests, practically, in nothing but a turn in the market. If he meet misfortune, nothing remains. It is essentially putting his money into a turn of chance. The effect, upon the man, of transactions so radical in their money outcome has come to be notable. Transactions of this kind are, indeed, separated very narrowly, if at all, from gambling, pure and simple. Both feed upon the same human propensity, and both lead to the same result. Each is an attempt, by the exercise of wit, to get what another is expected, by the want of wit, to lose. Both lead up to false notions of wealth accumulation. Both bring on the loss of mental equipoise. Each fills its participant with a dangerous character of excitement,— often a radical and desperate aggressiveness. No one knows these things better than the brokers themselves. They see, now and then, striking instances of moral and business degeneration under the stimulus of this excitement. They see, now and then, instances of men, pressed for margins, losing all sense of what is their own and what is another's. They witness, as well as the public, that almost unaccountable submergence of judgment and sense, under the effect of which trust funds are misappropriated, and bank funds embezzled, by those who have, at the time, no thought of not eventually making good the loss. They, as well as the public, know how quickly crime, thus secretly begun under the radiance of hope, soon expands into the daring of despair. They have seen, in nearly every community, men press eagerly towards these rainbows of fortune, only to fall quickly into disgrace and a prison. These impressive lessons are a part of the history of every considerable community. Instinctively we shudder for him who loves speculation, and can find the means for feeding that love in access to the moneys of another.

Cassatt was a banker, so far as the record discloses, without means of his own. Through 10 years he had, to the knowledge of defendants, poured a steady stream of margins into his deals on the board of trade. Whence did the money come? How was it recruited? Why should this losing, almost desperate, play against ill fortune keep on? No real friend of Cassatt, who knew his opportunities in Iowa, and his practices in Chicago, would have been without painful apprehension. No depositor in the Pella bank, coming into a knowledge such as the defendants had, would have let a day go by before withdrawing his deposit. No stockholder would have failed to institute instant and thorough investigation. The facts known to these defendants would, if communicated to the world, have put every intelligent man, interested in Cassatt's pecuniary condition, upon inquiry. They would have, intuitively, marked him out as a man in peril. Inquiry, in the situa-

tion of the defendants, was a moral duty. In their omission to perform that duty they proceeded at their peril. Neglect, in such a case, is followed by all the consequences of bad faith. "If," in the language of Knapp v. Bailey, 79 Me. 195, 9 Atl. 124, "a party has knowledge of such facts as would lead a fair and prudent man, using ordinary caution, to make a further inquiry, and he avoids the inquiry, he is chargeable with notice of the facts which, by ordinary diligence, he would have ascertained. He has no right to shut his eyes against the light before him. He does a wrong in failing to heed the signs and signals seen by him. It may be well concluded that he is avoiding notice of that which he, in reality, believes or knows."

These marts of trade are, in many respects, greatly beneficial to the interests of mankind. They balance, like the governor of an engine, the otherwise erratic course of prices. They focus intelligence from all lands, and the prospects for the whole year, by bringing together minds trained to weigh such intelligence and to forecast the prospects. They tend to steady the markets more nearly to their right level than if left to chance or unhindered manipulation. Nor are the purchase and sale of futures intrinsically wrong. They are the means of bringing about those stable and steadying results. But the tendencies and excesses of human nature—its susceptibility to warp in the fierce heat of excitement or distress—are facts to be heeded by the broker as well as by the public. He may not close his eyes to probabilities, or even strong possibilities, that are patent to the rest of mankind. If he does, the law rightly makes him accountable to those who thereby innocently suffer.