STATE BANK OF BINGHAMTON, Plaintiff, *v.* JULES S. BACHE and
Others, Defendants. (Action No. 1.)

STATE BANK OF BINGHAMTON, Plaintiff, *v.* JULES S. BACHE and
Others, Defendants. (Action No. 2.)

STATE BANK OF BINGHAMTON, Plaintiff, *v.* JULES S. BACHE and
Others, Defendants. (Action No. 3.)

Supreme Court, Trial and Special Term, Broome County, February 11, 1937.

*Hinman, Howard & Kattell [George L. Hinman, C. Addison Keeler, Thomas B. Kattell and A. Lawrence Abrams of counsel], for the plaintiff.*

*Lusk, Buck & Ames [Clayton R. Lusk, Harold Nathan, Alexander Levene and Thomas Epstein of counsel], for the defendants.*

PERSONIUS, J.   These actions were tried together, a jury being waived.

The plaintiff, a State bank (herein called the " bank ") was taken over by the Superintendent of Banks December 15, 1930; Andrew J. Horvatt (herein referred to as " Horvatt ") was its president, cashier and general manager.   The plaintiff alleges that Horvatt carried speculative brokerage accounts with the defendants, in his own and other names, with misappropriated assets of the bank which plaintiff seeks to recover in these actions for money had and received.

J. S. Bache & Co. is a copartnership, usually referred to as " Bache."   The partners are the defendants in each case.   The misappropriations are alleged to have occurred between March 20, 1928, and December 15, 1930.   During this period the personnel of the defendant partnership changed.   The defendants in Action No. 1 were copartners from March 20, 1928, to March 31, 1929. The defendants in Action No. 2 were the copartners from April 1, 1929, to December 31, 1929.   The defendants in Action No. 3 were the copartners from January 1, 1930, to December 15, 1930, the date of the closing of said bank.

That the assets of the bank were misappropriated by Horvatt, and that it was looted, clearly appears.   We refer later to the time, method and extent of the looting.   It is the plaintiff's claim that substantial amounts of the misappropriated assets were from time to time diverted and delivered to the defendants, under circumstances entitling the plaintiff to recover at least a part thereof.

In discussing the evidence, we should have in mind these questions: Were the various accounts which Horvatt opened and operated in his own and other names, in fact Horvatt's?   If so, did Malane, manager of defendants' Binghamton office, have knowledge thereof?   Did the defendants in receiving the diverted assets act in good or bad faith?   Did they have notice of facts putting them on inquiry?

Defendants' main office, in New York city, will be referred to as the " New York office;" its branch office in Binghamton, of which James J. Malane was at all times manager, as the " Binghamton office."

Malane kept ledger sheets of all accounts conducted through the Binghamton office, which are referred to as the "Binghamton Memoranda." They were substantially complete though the regular ledger accounts were kept in the New York office.

Reference will also be made to the "regular" or "active" files and to the "dumbwaiter" files. By "active" files is meant the ledger cards or accounts of commercial and savings deposits, open or closed, kept in the regular files of the bank. In addition a number of similar ledger cards were found in a dumbwaiter and in the store room. These are later referred to and described.

Of the multitude of transactions in evidence, we discuss the most important, and refer to others in groups. Of much of the testimony defendants say it does not establish notice of Horvatt's embezzlements. But it does bear on the underlying question whether the various accounts were in fact Horvatt's.

The bank was located at least one mile from the business center of Binghamton, in a small business and residential district occupied by mechanics and working people. In March, 1928, its stated capital was $100,000, and its purported deposits less than $1,250,000, of which only $122,407.36 were commercial deposits. The deposits of the three principal Binghamton banks located in the business district were from nine to ten million each. The plaintiff bank was comparable in size to the banks of Johnson City, Endicott and Union. In location and size, it was comparable to the ordinary outlying branch of a down town bank.

Throughout its existence, Horvatt kept its general books. Messrs. Mottram, Hidock and Michael Horvatt were its assistant cashiers and Polosky its commercial account bookkeeper.

Andrew J. Horvatt, prior to opening his private bank (1920) with a stated capital of $10,000, had no banking experience. While operating the plaintiff bank, he had a few side lines, one characterized by defendants as a "restaurant" and by the plaintiff as a "speakeasy." Malane admitted having the "impression" that Horvatt was "illegally selling liquor" and conducting an "unlawful beverage business" during prohibition.

James J. Malane, the manager of the defendants' Binghamton office, was a life-long resident of Binghamton. From 1907 until 1926 he was associated with the Binghamton brokerage office of Dyer-Hudson & Company, herein called "Dyer," and its predecessors, in different capacities. For the last fifteen years he was assistant manager. From December, 1926, to March, 1928, he was with the investment house of Chittenden-Phelps & Co., also of Binghamton. On April 1, 1928, he opened and became manager of the defendants' Binghamton branch. In short he was experienced in the brokerage business in Binghamton.

When Horvatt began trading with defendants in March, 1928, he and Malane were not strangers. On the contrary, they were quite friendly. Horvatt was a caller at Malane's home. Malane was a caller at Horvatt's home and private office. He was Horvatt's guest on automobile trips around the city and to distant points. In July, 1925, when Malane was assistant manager for Dyer, Horvatt contacted him, invited him to the bank and conferred as to "how business was transacted for banks in that [Dyer's] office." Promptly Horvatt opened several brokerage accounts with Dyer through Malane. An account in the name of the bank was substantially a cash, not marginal, account. The other accounts, opening with one or two cash transactions, soon became marginal, continuing as such until August 30, 1926. Following is a schedule of Horvatt's trading through Malane at Dyer's:

| | Name | Opened | Became marginal |
|---|---|---|---|
| 1 | State Bank | July 13, 1925 | Never |
| 2 | John P. Macey | Aug. 6, 1925 | Oct. 1, 1925 |
| 3 | Leo R. Donahue | Oct. 5, 1925 | Never |
| 4 | M. Blasko | Oct. 5, 1925 | March 8, 1926 |
| 5 | Elizabeth Horvatt | Oct. 6, 1925 | Oct. 6, 1925 |
| 6 | John Scerba | Feb. 1, 1926 | Feb. 25, 1926 |

| | Gross tradings, purchases and sales | Highest debit balance | Losses |
|---|---|---|---|
| 1 | . . . . . . . . . . . . | . . . . . . . . | . . . . . . . |
| 2 | $1,568,505 74 | $160,252 23 | $6,999 70 |
| 3 | . . . . . . . . . . . | . . . . . . . . | . . . . . . |
| 4 | 5,807,022 10 | 524,029 86 | 21,171 43 |
| 5 | 234,269 00 | 37,169 66 | 2,732 95 |
| 6 | 2,192,782 20 | 182,034 63 | 6,560 29 — profit |
| | $9,802,579 04 | | $24,343 79 |

Information and knowledge obtained by Malane in connection with Horvatt's trading at Dyer's is chargeable to defendants, Malane's subsequent principal. (*McCutcheon* v. *Dittman*, 164 N. Y. 355, 357.)

Horvatt opened each account. With insignificant exceptions, he gave all orders therein. All marginal calls were, at his request, made on, and paid by him. Malane personally handled the accounts. Everything indicated that they were in fact Horvatt's accounts. Macey was his secretary. Elizabeth Horvatt was his sister-in-law. Scerba was manager of and Blasko bartender in Horvatt's "restaurant." Leo R. Donahue was his brother-in-law, whose account has no significance except that a trading account

in the same name was later carried with Bache. Horvatt carried no account with Dyer in his own name.

These Dyer accounts were closed rather abruptly on Saturday, August 28, 1926, and Monday, August 30, 1926. Defendants say they were voluntarily closed by Horvatt. Plaintiff says they were closed at the instigation of Mr. Mitchell, Dyer's manager, and that Malane knew it.

On Saturday, August 28, 1926, Malane, then on vacation, was with Horvatt in Schenectady *en route* to Saratoga. Horvatt, at the *Bache* office in Schenectady, ordered all these Dyer accounts sold out. The order was not fully executed. Substantial holdings remained. On Monday, August thirtieth, Mitchell wired Dyer's New York office: " Those accounts are all going to be closed out this morning. I am writing you." Later the same day he wired: " Please sell out at the market."

On August twenty-sixth Mitchell had written Dyer's New York office criticising the accounts but not indicating any intent to close them out; in fact, he indicated the contrary. On the thirtieth, after ordering the accounts closed by wire, Mitchell wrote Dyer's New York office criticising the accounts, saying they were " unquestionably borrowing money at Horvatt's Bank," and further saying in part: " I have not yet been able to reason out why Malane * * * would introduce Horvatt to all the members of my firm under a name (Blasko) not his own." It would appear that between the twenty-sixth and thirtieth Mitchell had heard of such introduction. He testifies that he told Horvatt to take the accounts out of the office and that he later told Malane what he had heard of the fictitious introduction and that he was suspicious of the accounts. This Malane denies.

Defendants say Mitchell fabricated this story in his letter of August thirtieth in an effort to explain why the accounts were closed.

Malane denies introducing Horvatt in New York as Blasko, saying he introduced him as Horvatt. On a previous examination he denied ever introducing Horvatt at all. Horvatt testified that he was introduced by Malane as Blasko. As between the testimony of Malane and that of Mitchell and Horvatt, the documentary evidence tends to support the latter. Mitchell did sign the telegrams finally closing the accounts on the thirtieth. On the same day he wrote New York referring to the alleged fictitious introduction. Where did Mitchell get the idea of a fictitious introduction except from the New York office? Unless it had advised Mitchell of such fictitious introduction, would Mitchell have concocted the story, and charged Malane therewith in a letter to the New York

office? *If untrue, they would know it.* The logical inference seems to be that after writing the letter of August twenty-sixth Mitchell heard of this fictitious introduction, told Horvatt to take his marginal trading accounts out of the office, as he testifies, and that Horvatt, instead of placing the closing order through Dyer, as he had placed every other order, placed it through Bache in Schenectady. The order not being completely filled, Mitchell finally closed the trading accounts on Monday, the thirtieth. The bank account, a cash account, was continued in the office as such as long as Malane remained with Dyer. The trading accounts remained closed. Knowing Horvatt's trading propensities, as disclosed by the evidence, it seems strange that if he voluntarily closed them, he did not voluntarily reopen them.

Why the accounts were closed is not so important as what Malane must have learned from Horvatt's operations through Dyer, nearly two years before his operations through Bache began. Malane then knew that Horvatt, president of a small bank, previously unknown to Malane, had opened, operated and financed four speculative and losing accounts, in the names of his relatives and employees, and produced money to finance the same, trading in and out to the extent of over $9,000,000. He had apparently introduced Horvatt to the New York office as Blasko. The accounts had been closed by Dyer under a cloud.

Malane remained with Dyer three months. In December, 1926, he went with Chittenden-Phelps & Co. Horvatt became Malane's customer there.

Malane was engaged to open defendants' Binghamton office in February, 1928, and opened it April first.

Malane says he had no conversation with Horvatt relative thereto. However, Horvatt became the first customer there. Even before the office was opened, he conducted one sale and one purchase through it, or through Malane. He promptly opened *three* speculative accounts. Trading therein from April tenth to May seventeenth, five weeks, was as follows:

SCHEDULE A.

| Account | Date opened | Total purchases |
|---|---|---|
| 1 Elizabeth O'Day | April 10, 1928 | $312,687 50 |
| 2 Mary B. Donahue | April 12, 1928 | 1,859,577 50 |
| 3 Leo R. Donahue | April 12, 1928 | 57,630 00 |
| | | $2,229,895 00 |

| Net losses | Highest debit balance |
|---|---|
| 1 $5,096 38 | $178,138 15 |
| 2 42,027 19 | 997,990 69 |
| 3 1,067 41 | 57,681 49 |

$48,190 98

These purchases were all speculative and sold without intervening delivery.

The following schedule, B, shows the volume of trading, the net losses and the cash and securities delivered into all the accounts from April 10, 1928, until the bank closed, December 15, 1930. It is *not* a schedule of damages claimed.

SCHEDULE B.

| Account | Date opened | Cost of securities bought and sold without intervening delivery * |
|---|---|---|
| 1 Elizabeth O'Day | April 10, 1928 | $591,314 28 |
| 2 Mary R. Donahue | April 12, 1928 | 14,334,100 16 |
| 3 Leo R. Donahue | April 12, 1928 | 394,210 60 |
| 4 H. Morrissey | June 11, 1929 | 9,484 38 |
| 5 H. E. DeWitt | Sept. 9, 1929 | 30,802 50 |
| 6 A. J. Horvatt | Oct. 1, 1929 | 1,180,584 24 |
| 7 M. Blasko | July 23, 1929 | . . . . . . . . . . . . . |
| 8 State Bank | March 20, 1928 | 3,523,261 22 |

$20,063,757 38

| | Net loss | | Cash delivered in |
|---|---|---|---|
| 1 | $16,408 68 | | $23,162 58 |
| 2 | 274,106 57 | | 157,875 09 |
| 3 | 19,505 80 | | 46,567 34 |
| 4 | 263 62 | (profit) | 10,884 50 |
| 5 | 1,937 05 | | 4,337 05 |
| 6 | 41,879 05 | | 170,131 69 |
| 7 | . . . . . . . . . . | | 1,651 50 |
| 8 | 44,621 62 | | 648,830 04 |

| $398,195 15 | $1,063,439 79 |
|---|---|

* The cost column includes interest charged

| | Securities delivered in free and sold | Debit balances of January 29, 1929 |
|---|---|---|
| 1 | $1,590 55 | $53,840 02 |
| 2 | 392,403 58 | 1,376,339 46 |
| 3 | 7,721 95 | 73,920 62 |
| 4 | .......... | Account not then opened |
| 5 | .......... | "      "   "   " |
| 6 | 2,170 40 | "      "   '"   " |
| 7 | 9,701 00 | "      "   "   " |
| 8 | 2,434,911 89 | 599,175 18 |
| | $2,848,499 37 | $2,103,275 28 |

Defendants received commissions on these accounts aggregating $89,577.55.

The size, *i. e.*, the volume of trading in these individual accounts (Schedule B) attracts our attention. Defendants say they mean nothing. Mr. Malane thought there were others as large as the Mary B. Donahue account but he could point to none. Occasionally fifteen to twenty-five orders were placed in these accounts in one day.

Over $250,000 of the total loss was sustained before the crash in 1929, and only about $143,000 of it was sustained thereafter.

These accounts were financed: (1) By setting up credits in defendants' deposit account with the bank, (2) by cashier's checks, (3) by New York drafts on the bank's New York depository, (4) by currency (all termed *cash*), and (5) by *securities* bought and paid for in the bank account, with defendants, and transferred to individual accounts, (6) by *securities* bought and paid for elsewhere and transferred to the individual accounts. There were remittances *out* of these accounts referred to later.

The damages claimed, or assets diverted and lost, are reflected in the following schedule, C:

SCHEDULE C.

| | Account | Credits set up in defendants' deposit account | Cashier's checks remitted to defendants |
|---|---|---|---|
| 1 | Mary B. Donahue | $62,500 00 | $81,174 06 |
| 2 | Leo R. Donahue | .......... | 17,152 76 |
| 3 | Elizabeth O'Day | 1,000 00 | 5,319 18 |
| 4 | A. J. Horvatt | .......... | .......... |
| 5 | H. Morrissey | .......... | .......... |
| 6 | H. E. DeWitt | .......... | .......... |
| 7 | M. Blasko | .......... | .......... |
| 8 | State Bank | .......... | 12,189 97 |
| | | $63,500 00 | $115,835 97 |

| | New York drafts remitted to defendants | Horvatt's personal checks on plaintiff remitted to defendants | Currency paid to defendants |
|---|---|---|---|
| 1 | ........ | $7,538 03 | ........ |
| 2 | $1,107 08 | 6,900 00 | ........ |
| 3 | 4,834 04 | 9,857 46 | $2,151 90 |
| 4 | ........ | 163,509 64 | 6,622 05 |
| 5 | ........ | 10,884 50 | ........ |
| 6 | ........ | 3,078 34 | 1,200 00 |
| 7 | ........ | ........ | ........ |
| 8 | ........ | 44,842 86 | ........ |
| | $5,941 12 | $246,610 83 | $9,973 95 |

| | Securities bought and paid for through Bache and returned to Bache and sold | Securities bought elsewhere and delivered to Bache and sold |
|---|---|---|
| 1 | $161,226 49 | $196,583 85 |
| 2 | ........ | ........ |
| 3 | 1,191 75 | 179 80 |
| 4 | 2,170 40 | ........ |
| 5 | ........ | ........ |
| 6 | ........ | ........ |
| 7 | 9,701 00 | ........ |
| 8 | 11,435 50 | ........ |
| | $185,725 14 | $196,763 65 |

Grand total, $824,350.66.

Mary B. Donahue and Leo R. Donahue were Horvatt's sister and brother-in-law. The three lived together. Malane visited their home. Malane says that Horvatt told him that " anything he had would be hers." There was no present joint ownership. Such explanation could not apply to the other accounts.

Elizabeth O'Day (Horvatt) was the wife of Horvatt's brother Michael, an assistant cashier in the bank. An account in her married name was conducted with Dyer. Malane says he understood " Elizabeth O'Day " to be Mrs. Horvatt's mother, Mrs. Dennis O'Day, but admitted that Horvatt said: " Mike's wife would have some interest in it " (the account). The address on the account was that of Michael Horvatt, not Dennis O'Day.

Malane says Horvatt wanted to buy some securities for the former's mother-in-law, Margaret Morrissey. Malane captioned the account " H. Morrissey," saying he had been told that Mrs. Morrissey's first name was " Honora." She lived with Malane.

She was always known as and used the name "Margaret." She was elderly, inexperienced and had little means. She contributed no money. When asked who financed the account, Malane replied: "Don't know whether it was Andrew's or the bank's. He was financing it through the bank." All securities purchased and paid for therein, save one, were transferred to the Donahue accounts as collateral.

Harriet E. DeWitt's account was first labeled and noted on the check book "Miss M. A. DeWitt." Malane understood she was a friend of Horvatt, residing in Rochester. The address on her account was Box 1010, Binghamton, a number used by Horvatt and other friends.

M. Blasko was the "restaurant" bartender in whose name Horvatt carried a Dyer account.

Obviously these individuals did not operate the accounts.

Horvatt testified that he asked Malane if he could open accounts "*in*" these various names and that Malane assented. Malane testified that in each instance Horvatt stated his desire to open an account "*for*" the respective parties.

Concededly Horvatt opened each account, stated that "he would give the orders," and asked that calls be made on him. Malane so testified. Horvatt gave all the orders. The margin calls were made on him by Malane. Horvatt met them. He obtained or forged indorsements on defendants' checks out. All confirmations and notices from New York ultimately found their way to Horvatt and were kept in his private office.

On cross-examination Malane admitted that he possibly might have thought that the money which went into the accounts "was Horvatt's." Asked whether he did not believe that these accounts were Horvatt's personal accounts, he replied, "Not entirely." On a previous examination Malane was asked, "Q. What reason did Horvatt give at any time for having these accounts handled by him in these various names rather than in his own?" and replied, "A. I don't know as he ever gave a reason. He never told me a reason. He left that to me to assume that he did not want people of this Ward, I suppose —." Defendants say this answer, given after the bank closed, was based on what he had then learned. Malane did not so say. He seems to have referred to the period when the accounts were opened. He very apparently meant that he assumed Horvatt wanted to conceal his trading from the people of his ward.

This is significant. Concededly when a customer opened a brokerage account in the name of another, defendants (and Dyer) required a *written authorization*. Malane so advised Horvatt who promised to obtain them. He never did, except possibly as to one

account with Dyer. The authorizations were supposed to come through the local office, *i. e.*, through Malane. Malane says Horvatt told him that he (Horvatt) had delivered them direct to the New York office. He had not. Malane never inquired of New York. The New York office knew the authorizations had not been furnished. Malane certainly must have known that no written authorizations had been obtained from his mother-in-law, Mrs. Morrissey.

These individual accounts were Horvatt's, conducted in dummy names. Malane could not help but know it. We hold that he did.

The account in the name of the bank was largely a speculative account, operated for the benefit of Horvatt and his dummy accounts. The *bona fide* customers of a bank may legally trade through an account in its name but the bank cannot "lawfully speculate for itself and risk capital and deposits" in speculative trading. (*Central National Bank* v. *White*, 139 N. Y. 631, 633; *Block* v. *Pennsylvania Exchange Bank*, 253 id. 227, 230.)

We conceive the trading of the ordinary customer to consist of the delivery of a security to be sold, its sale, and the remittance of the proceeds; or the giving of an order to buy, the purchase, remittance of costs and delivery. In a few instances, the security may be purchased and sold without intervening delivery.

Schedules B and C include the bank account. In it there were purchased, paid for and delivered, securities costing *only* $589,033.77. There were bought and sold therein without intervening delivery securities costing $3,523,261.22 at a loss of $44,621.62. The total purchases far exceeded the purchases by each of the three principal banks in Binghamton, though each of them was seven times larger than the plaintiff's. In this bank account seventy-one per cent of the securities purchased and delivered were shipped in street name, about twelve per cent in Horvatt's name and about four per cent in the name of his relatives and employees. In comparison, those delivered to other banks in Binghamton and suburbs in street name were very few, or from one to two per cent. The debit balances of the same three principal banks in Binghamton, during the same period, were from $21,000 to $23,000; that of the plaintiff bank frequently substantially in excess of a half million. Comparison of plaintiff's account with other up State banks was impossible, as the records, in the process of changing storage facilities, had, as defendants claimed, been destroyed during the trial. During the same period the purchases and sales without intervening delivery in each of the three principal banks in Binghamton were from $16,000 to $415,000 as compared with over $3,500,000 in the State Bank account and over $20,000,000 in all the Horvatt accounts.

Much of the trading was in "when issued" and "received against payment" securities, none of which required margin, thus permitting speculation without investment.

Yet the defendants say this bank account was not a speculative but a cash account, i. e., one through which the bank buys for its portfolio and for *bona fide* customers. For this reason they waived interest amounting to $14,529.54, notwithstanding a Stock Exchange rule requiring interest to be deducted or added where settlements with customers are made before or subsequent to actual settlement date. We think the character of an account must be determined by the character of the trading rather than the charging or failure to charge interest. With comparatively few exceptions, all the trading in this account labels it a speculative and not a cash account, as does its size or volume of trading when compared with the accounts of other banks. The account was financed by setting up credits to Bache's deposit account, etc., the same as the individual accounts. The memoranda ledger kept in Binghamton plainly showed computation of profits and losses from time to time, as in the Mary Donahue account. These figures had been erased in the bank account. Although Malane initiated the keeping of these memoranda ledger sheets in the Binghamton office, he claimed to have given them little attention. However, his own handwriting or figures appeared on several pages. He could give no reason for the erasures.

Furthermore, the large percentages of securities bought in Horvatt's name, or in street name but transferred to him or his designees, labeled it as Horvatt's speculative account backed by the credit of the bank. Here again, he opened, ordered and financed with bank assets.

Horvatt's first purchase in the bank account was speculative, held and sold at a profit for which Malane remitted by check. During the first few weeks thirty-five distinctive blocks were purchased for Horvatt to Malane's knowledge.

That all these accounts were treated as a unit, to the knowledge of Malane, is shown by the inter-account transfers of securities. At the outset, and on April 13, 1928, six $1,000 bonds were received in the Mary B. Donahue account as collateral. On April twenty-first they were marked, "Tsf. to E. O'Day account," placed therein as collateral and marked, "Tsf. from M. B. Donahue." The bonds were not shipped from New York to Binghamton when transferred. Another block of securities were out and in the Mary and Leo Donahue accounts two or three times between November, 1928, and August, 1929. Single remittances as collateral or margin were split between two accounts; remittances out of one account were

immediately credited into another account. The final debit balance in the Mary Donahue account was transferred bodily to Horvatt's account. The major transfers were from the bank account to individual accounts. If the bank account was a cash account, a regular customer's account, the securities bought and paid for therein belonged to the bank or such customer. Of course, Mary and Leo Donahue and Elizabeth O'Day had no occasion to buy in that account. There were open accounts in their names. But about 128 blocks of securities bought and paid for in the bank account were immediately, upon receipt by the Binghamton office, diverted therefrom, returned to New York and delivered free into the Mary B. Donahue account, and about four into the O'Day, Horvatt and Blasko accounts. This practice began in 1928. When received in the Binhgamton office from New York, the securities were returned to New York, usually on the same day, always within two or three days, as collateral in an individual account and ultimately sold therein.

The defendants claim that such transfers did not come to the attention or knowledge of Mr. Malane or other representatives of the defendants. When the securities were received in the Binghamton office, a receipt was returned to New York. When they were delivered to the customer (the bank) its receipt should have been taken for the protection of the Binghamton office. When they were returned to New York for credit in the individual accounts, they were accompanied by a shipping letter. Miss O'Connell, a young lady of seventeen years, entered the office in January, 1929, as telephone operator. She and Malane testified that she checked the securities on arrival, attended to delivery, obtained the customer's receipt, and made out the shipping letters for shipping to New York. Malane testified that he signed both the receipts for delivery in and shipping letters out but " paid no attention " to their contents. (Even this explanation does not cover 1928.) Miss O'Connell testified that she sent the State Bank securities to it by its messenger, Polosky, with a receipt to be signed and returned. Polosky testified that his dealings were with Malane, that whenever he took securities to the bank, he, Polosky, signed the receipt and left it at Malane's office. It seems illogical that Malane or Miss O'Connell would have delivered the securities and trusted Polosky to return a receipt, especially in view of the fact that she says they were frequently not returned. Although requested to produce the State Bank receipts for these 132 blocks of securities, only seven were produced; five were signed by Polosky, two by Horvatt. No receipts were produced showing delivery of about 125 blocks of these transferred securities. Although Miss O'Connell testified

that she made out all such receipts, of over fifty only six were in her handwriting. Two were written by Malane. Why were only seven receipts for the 132 blocks of securities delivered out of the bank account and transferred to the individual accounts, producible? Malane testified that these receipts were important and carefully preserved. The answer is that the securities did not pass out of the Binghamton office on arrival from New York but were immediately reshipped to New York as collateral in the individual accounts without going through the form of making delivery to the bank. As to the shipping letters returning the securities to New York, Malane not only signed them all, but in several instances corrected them in his handwriting.

Many of the transferred stocks and others were in street name. This necessitated Malane's signing a release of power on the back. Again, Malane says, some clerk rubber-stamped the release and he signed without paying any attention. Some of the transfers were distinctive, i. e., six two-share lots, nine three-share lots, nine one-share lots, eleven one-share lots. They were received in Binghamton and returned the same day or the following day. If these transfers had been isolated instances, they might have escaped attention. These transfers were all entered on the Binghamton memoranda ledger. Some of the early entries were in Malane's handwriting.

We cannot escape the conclusion that Mr. Malane knew of these transfers and thereby knew that all the accounts were being handled by Horvatt for Horvatt.

The transfer of substantial blocks of General Motors (G. M.) and National Bellas Hess (N. B. H.) in March, 1929, is significant. Horvatt had purchased in the bank account 3,500 shares of G. M. and sold 1,500 shares. He had purchased 3,000 shares of N. B. H. and sold 500 shares. The remaining 2,000 shares of G. M. and 2,500 shares of N. B. H. represented a debit of over $360,000. The bank's debit balance was then nearly $600,000 and New York was asking for reduction. Although these securities had greatly depreciated, they were removed bodily, without intervening delivery or shipment to Binghamton, to the Mary Donahue account and later sold therein at a loss of about $50,000. Malane testifies that he was asked by New York to get shipping instructions and settlement for these securities; that he told Horvatt who replied that these stocks did not belong in the bank account but had been bought in the Mary B. Donahue account; that Horvatt said he wanted the error corrected immediately and the securities reversed to the Donahue account. Horvatt testified that when called upon for settlement, he told Malane that the bank could not stand the loss or raise the money and asked Malane to transfer the stock.

If this change was in correction of an error, called a " reversal," it has little significance. If it was, at Horvatt's request, called a " transfer," it shows that both he and the defendants treated both accounts as Horvatt's. If it was an error, there were eleven errors as at least eleven separate orders were placed and executed in accumulating this stock. Each purchase was twice confirmed in writing. The bank (Horvatt), therefore, had twenty-two confirmations but did not discover the " error " until asked to settle. While this stock, and more of the same purchase, stood in the bank account, Horvatt sold 1,500 shares of General Motors and 500 shares of National Bellas Hess *in that account*. In ordering such sales, he must have specified that account. Though Malane's office was accused of an error of over $300,000 which would have caused a loss of at least $50,000 to the bank account, Malane never called Horvatt's attention to these written confirmations or the previous sales but supinely went on the theory that the " customer was always right." Malane clearly distinguished between a reversal (rev.) in case of error and a transfer (tsfd.) upon request, yet on the Binghamton memoranda sheets are entered no less than seven notations as to this stock " 3/2/29 tsfd. to 855 " (the Donahue account) and " tsfd. from 3399 " (the bank account). Corrections of errors were uniformly marked " rev." These transfers were not so marked even on the New York ledger. If the Mary B. Donahue account was in shape to absorb this transfer on March 2, 1929, when Malane directed it, it should have been then made on the New York books. It was not made until March twenty-eighth. On the former date her account was not sufficiently margined to absorb the loss. This margin was built up, largely by transfer of free securities from the State Bank account (paid for therein by cashier's checks), so that on March twenty-seventh it was sufficiently margined. The transfer was made on the twenty-eighth. Finally, a dividend of $625 was received on the National Bellas Hess stock *after* the transfer. It was credited to the *bank* account and stayed there. No tax was paid on the transfer. True, none would be payable if it was a reversal. Nor would one be payable if it was simply a transfer from one Horvatt account to another. The circumstances and entries made compel us to conclude that these stocks were changed from the State Bank account to the Mary B. Donahue account, not because of an error, but at Horvatt's request. In these many substantial respects the accounts in the name of individuals and the account in the name of the bank were treated by both parties as one. In every respect they were treated as the accounts of Horvatt, the man who opened and gave all the orders in each (except comparatively few in the bank account), the man

on whom all marginal calls were made and by whom all were met. We hold and find that the accounts in the names of John P. Macey, M. Blasko, Elizabeth Horvatt and John Scerba with Dyer-Hudson Company, and the accounts in the names of Elizabeth O'Day, Mary B. Donahue, Leo R. Donahue, H. Morrissey, H. E. DeWitt and Andrew J. Horvatt with the defendants were in fact Horvatt's trading accounts; that the account with the defendants in the name of the bank was principally Horvatt's and to a large extent used for his personal trading; that all of said accounts with the defendants were operated by Horvatt as a unit; that all this was known to Malane from the opening of the accounts.

Some other incidents bear on the question of notice and defendants' good faith.

Upon opening its Binghamton office, the defendants opened deposit accounts with the Binghamton banks. The account with plaintiff was opened April 2 and closed May 22, 1928. In the account at plaintiff's bank but one deposit was made by defendants. Subsequent deposits were set up by the bank. Malane was notified of each, then prepared a deposit slip and credited the amount to the designated trading account. These deposit credits were entirely fictitious. They aggregated $123,820.50. The Mary Donahue and O'Day accounts were financed entirely by such credits during the first five weeks (Schedule A). A credit of $50,000 was set up for Mary B. Donahue at one time. All securities purchased in the bank account during this period were paid for by such deposit credits. On May sixteenth there was a balance in this deposit account of $99,093.28. It was entirely withdrawn by May twenty-second. Although defendants carried substantial balances in the other Binghamton banks at all times, they never reopened the deposit account with plaintiff. Malane says that Horvatt became incensed because defendants did not carry a larger balance, and told Malane to close the account. There seems to have been an agreement that the defendants would carry a minimum balance of $5,000. The balance was never less than that amount. It was over $8,000 when finally closed. Why should Horvatt have ordered it out? Why was it closed? Did not the trading in excess of $2,000,000, with a loss of over $48,000 in five weeks (Schedule A), suggest something suspicious? Immediately following the closing of the deposit account, there was a marked lull in the trading and the next remittance in the bank account was in currency.

For a time Horvatt remitted currency into his own, the O'Day and DeWitt accounts. Currency has no earmarks but it is a very unusual medium for a banker to use in making remittance.

From time to time when the debit balances of these accounts, especially the bank account, became over large, and under-margined, there was unusual activity in reducing them. The incident in connection with the General Motors and National Bellas Hess stock occurred during one of these clean-ups. Frequently one of Horvatt's personal checks was remitted to reduce the bank account balance. Mr. Moses, manager of the New York office, was at such times at least giving personal attention to the accounts.

Another unusual transaction — Malane received and conveyed to Horvatt a "tip" on St. Paul preferred. Malane says Horvatt wanted to buy a block for Malane, but he forbade it. However, Horvatt bought in the Mary Donahue account September 6, 1929, later telling Malane that he bought it for H. Morrissey, Malane's mother-in-law. Malane objected. What happened? The stock was taken up with Malane's personal check of $1,550 and a note signed (apparently by Malane) "Mrs. Margaret Morrissey" and discounted at the plaintiff bank with the stock as collateral. Ultimately Malane personally took a loss of about $2,000 on the transaction. Why, if it was purchased without Malane's authority? Why bought for Mrs. Morrissey in the Donahue account when the H. Morrissey account was open? The only logical answer is that Malane himself bought the stock in the Mary Donahue account and when it depreciated, he naturally took the loss.

Malane testified that Horvatt stated he was worth a million, that he had a half million in real estate, that, while riding, Horvatt exhibited some papers, saying they represented $750,000 in bonded warehouse certificates, and, on another occasion, he exhibited other papers, saying they represented between a half million and a million profit in National City Securities; he said he owned ninety per cent of the bank stock valued at $600 per share. Malane further testified that prominent residents of Binghamton expressed the opinion that Horvatt was very wealthy, and that he, Malane, shared their belief. Attention is called to the fact that other Binghamton banks carried deposits in the plaintiff bank until it closed. But what these parties and banks did not know, which Malane did know, was Horvatt's extensive speculation through Dyer and the defendants in the names of his relatives and employees and the excessive losses therein.

There were indications, known to Malane, that both Horvatt and the bank, rather than being opulent and financially strong, were pressed for money. Both were demanding ready cash and Malane was assisting them to obtain it. Horvatt testified that Malane repeatedly told him the New York office was demanding

money, that they talked it over, that Horvatt asked Malane to "try to stall off New York and he agreed to help me along until the following day or as long as he could keep New York off." Malane denies this, but what happened? Malane testified that whenever he ordered securities shipped from the New York office to Binghamton, he always had funds in hand to pay for the same. But repeatedly Malane ordered securities shipped to Horvatt and the bank, reporting to the New York office that he had received the purchase price and deposited it to the defendants' credit in another Binghamton bank, when in fact the purchase price was not deposited for from one to five days thereafter. Occasionally it was not deposited until the securities were ordered sold. Malane explained that on these occasions, Horvatt gave his personal check to Malane to hold during the interim. Why? Horvatt had told Malane that he had from $200,000 to $300,000 idle surplus. The bank was so prosperous that its stock was valued at $600 per share. Payment for these securities was the obligation of the bank or Horvatt. Why was it necessary to take the latter's personal check and hold it? Did this indicate wealth or the contrary? Malane testified that Horvatt's excuse was that the customer for whom the securities were intended was out of town. This does not explain the bank's inability to take care of its customers' obligation. On some occasions the obligation was *ultimately paid* by Horvatt's personal check. Why take and hold one such check for the obligation, and then use another to pay the obligation? In connection with another purchase, Malane says Horvatt gave the excuse that he made it for the Greek Catholic Union of which he was treasurer, but the committee refused to approve the purchase. Horvatt or the bank finally took it up at a loss of over $13,000. If true, Malane knew that Horvatt was purchasing $100,000 worth of securities for a customer without authority and that he or the bank was standing the loss. The amounts reported as paid before actually paid aggregated many thousand dollars, single items being as high as $30,000. Defendants admit that the practice may have been improper or stupid but say it did not prove embezzlement. Probably not, standing alone, but we are considering the facts as a whole. Whether or not Malane agreed to "stall off" New York, his co-operation certainly helped to ease the situation.

Again, when selling securities, Horvatt was demanding and receiving cash on delivery to Malane at Binghamton without awaiting report of sale. The proceeds of the sale were *estimated* and immediately paid. Usually the estimate was too low, sometimes too high. In either event it was adjusted by a second check.

Again Malane was helping his wealthy customer and a prosperous bank.

Defendants comment at length on the credibility of the plaintiff's witnesses. Horvatt and Polosky were convicted felons. Mottram confessed participation in the felonies. Malane was interested but had a clear record. Yet during the trial we were forced to the conclusion, and noted in our minutes, that he seemed "not as frank as Horvatt," that he "hedged" and had, in some instances, "poor recollection."

Malane was manager of the Binghamton office. Yet he professed to have no idea whether the Mary Donahue and other accounts resulted in profit or loss though he had entered $62,500 credit and remitted but $20,000 during the first five weeks; he paid "no particular attention" to Horvatt's accounts at Dyer's; he says he never paid any attention to the Blasko account, in which the purchases were nearly three million; to the published financial statements of the Binghamton banks; to the Binghamton memoranda sheets or the ledger transcripts sent up from New York, or to the debit balances in this account frequently running into six substantial figures. Though some one computed the profits and losses, he says he paid no attention thereto, nor was it called to his attention. His attention was not attracted to the distinctive lot purchases of Horvatt, to the source of the moneys coming into defendants' or Dyer accounts, he never examined to determine whether they were profitable or not. He signed receipts, shipping letters and waivers for the transfer of stock from street name, in connection with the shifting of securities from the bank account to the individual accounts, without paying any attention to the contents. He gave no attention to the volume, to the character of the securities, to the securities going into the Mary Donahue account free, or to many other items which we might mention. Malane was credulous and impressed by Horvatt's bragging, by what he heard concerning Horvatt on the street, but says he gave *no attention* to the information on his own books or that contained in documents which were daily passing over his desk and being signed by him. Malane was not stupid; in many respects he exhibited keenness. He had had long experience.

In *Beard* v. *Milmine* (88 Fed. 868; affd., *Lamson* v. *Beard*, 94 id. 30), GROSSCUP, J., makes the trite and, we think, applicable statement: "He has no right to shut his eyes against the light before him. He does a wrong in failing to heed the signs and signals seen by him. It may be well concluded that he is avoiding notice of that which he, in reality, believes or knows."

We think an examination of the record would show Malane contradicted by the documents and his previous testimony in many more instances than the plaintiff's witnesses.

Did the defendants receive the diverted assets in good or bad faith? Did they have notice of facts putting them on inquiry?

The misappropriated assets consisted of negotiable instruments, *i. e.,* bank drafts, cashier's checks, personal checks, bearer bonds, currency and stocks. The latter are negotiable (Pers. Prop. Law, §§ 166, 167, 168, 183) if of a domestic corporation or a corporation of another State whose laws are consistent with that act. ( *U. S. Fidelity & Guaranty Co.* v. *Newburger,* 263 N. Y. 16, 23.) Did the defendants take them as holders in due course? One is a holder in due course if, among other things, he takes in good faith and *then* has no notice of any *infirmity in the instrument* or *defect in the title.* To constitute such notice, the taker must have had " actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." (Neg. Inst. Law, §§ 91 and 95.)

We limit our inquiry to the question of "sufficient" notice rather than " constructive " notice. Precision in the use of the latter term seems never to have been acquired. (*Williamson* v. *Brown,* 15 N. Y. 354, 359, 360.)

" The courts are careful to guard the interests of commerce and to protect and strengthen its great medium, commercial paper, but they are also careful to defeat titles taken in bad faith or with knowledge actual or imputed which amounts to bad faith." (*Wagner Trading Co.* v. *Battery Park Nat. Bank,* 228 N. Y. 37, 45.)

Where an agent, in this case Horvatt, uses a check or other negotiable instrument of his principal to pay his individual debt, the " infirmity in the instrument " or " defect in the title " appears on the face of the instrument, *i. e.,* from the " form " thereof, and bad faith, or notice putting the holder on inquiry, is thereby shown as *matter of law.* (*Rochester & C. T. R. Co.* v. *Paviour,* 164 N. Y. 281; *Ward* v. *City Trust Co.,* 192 id. 61; *Bischoff* v. *Yorkville Bank,* 218 id. 106; *Gilliland* v. *Lincoln-Alliance Bank,* 239 App. Div. 68; affd., 264 N. Y. 517; *Lamson* v. *Beard,* 94 Fed. 30.) The last case is quite parallel. We refer to it without quoting.

Where such infirmity or defect does not appear on the face of the instrument, bad faith or notice and the duty to inquire may be established as *matter of fact* by facts not appearing on the face of the instrument. (*Kelso & Co.* v. *Ellis,* 224 N. Y. 528; *Wright* v. *Bartholomew,* 66 App. Div. 357; *Arnd* v. *Aylesworth,* 145 Iowa, 185; 29 L. R. A. [N. S.] 638; 123 N. W. 1000; *Brown* v. *Taber,* 5 Wend. 566; 8 C. J. 496, § 707.) In the latter it is said: " notice

may be imputed from: (1) The face of the instrument (form), in which case the question of notice is generally one of law for the court; or (2) *from facts or circumstances aliunde the instrument*, in which case the question of whether the purchaser had sufficient notice to affect his good faith is generally one of fact for the jury." In *Kelso & Co.* v. *Ellis (supra) the form gave notice.* The court struck out evidence of dealings between the parties to the note and directed a verdict for the plaintiff. The Court of Appeals reversed and granted a new trial, saying (p. 535): " Was plaintiff chargeable with knowledge of such facts that its action in taking the instruments might be found by a jury to amount to bad faith? * * * The relation between [payee's] order for the piano to be shipped by the plaintiff to defendants [makers] and the notes of defendants payable to his order, would, we think, under the circumstances, *sustain a finding that ' by the simple test of honesty and good faith '* * * * *it became the duty of plaintiff to inquire as to the real situation between* [payee] *and the defendants."* Again (p. 537): " The question as to whether the plaintiff was a *bona fide* purchaser was one of fact for the jury."

All the facts and circumstances of the transactions between the parties are relevant. The question is, what do they *collectively* show? " Although there is no one circumstance decisive of the case, yet the circumstances combined," may " be sufficient to have put the plaintiff on enquiry." (*Brown* v. *Taber,* 5 Wend. 566, 568.) " However, it is rarely decided that any one fact is, or is not, conclusive evidence of notice, but the question ordinarily involves several facts and circumstances more or less peculiar to the particular case and generally requiring the question to be submitted to the jury." (8 C. J. 508, § 716; see, also, *Strong* v. *Jackson,* 123 Mass. 60, 62, 63.) " Gross carelessness, although not of itself sufficient as a *question of law* to defeat title, constitutes evidence of bad faith." (*Canajoharie Nat. Bank* v. *Diefendorf,* 123 N. Y. 191, 202.)

We find the terms " knowledge," " bad faith," " duty to inquire." We are not so much interested in defining terms as in weighing the evidence. Certainly *bad faith* can be established without proving *actual knowledge* and it would seem that a *duty to inquire* may be established by something less than proof of *actual bad faith.* In *Rochester & C. T. R. Co.* v. *Paviour* (164 N. Y. 281, *supra,* at p. 284) the court said: " Even if his [holder's] actual good faith is not questioned, if the facts known to him should have led him to inquire, and by inquiry he would have discovered the real situation, in a commercial sense he acted in bad faith and the law will withhold from him the protection that it would otherwise extend." Page 285: " If he * * * was willing to trust

him without inquiry, under suspicious circumstances of a *substantial character*, he must stand the loss for he failed to discharge a duty required by commercial integrity." Page 286: "One who suspects, or ought to suspect, is bound to inquire, and the law presumes that he knows whatever proper inquiry would disclose."

Having held that the accounts in others' names and, to a large extent, the account in the bank's name, were, to Malane's knowledge, in fact Horvatt's, it follows that a remittance of a bank draft, a cashier's check or security known to Malane to belong to the bank, Horvatt's principal, into one of these accounts, was the same as the remittance thereof into Horvatt's personal account to pay his personal debt. The bank's drafts on its New York depository were, in effect, the bank's checks thereon. A cashier's check is an order or direction to the bank to pay the payee from its funds. As we have pointed out, if an officer of a corporation draws and issues its check to pay his individual debt, the payee is put on inquiry as a matter of law. So if an officer of a bank draws and uses the bank's check to pay his individual debt, the payee is put on inquiry. The delivery by an agent or officer of his principal's securities to liquidate his individual debt stands on the same footing as the delivery of his principal's check. (*Fidelity Nat. Bank & Trust Co.* v. *Southern United Ice Co.*, 78 F. [2d] 438, 440; *Wilson* v. *Metropolitan E. R. Co.*, 120 N. Y. 145, 150.)

Drafts and/or cashier's checks were delivered by Horvatt into his accounts in the names of Mary B. Donahue, Leo R. Donahue, Elizabeth O'Day and State Bank. The bank's securities were so delivered into his accounts in the names of Mary B. Donahue, Elizabeth O'Day, A. J. Horvatt and M. Blasko. The defendants were thereby given notice, and put on inquiry as a matter of law, by the form of such remittances, *i. e.*, the facts appearing upon the face thereof.

True, most of the cashier's checks and drafts were signed, not by Horvatt, but by assistant cashiers, but "the fact that [they were] signed by another officer [than the defaulter] in no way altered the situation." (*Lanning* v. *Trust Co. of America*, 137 App. Div. 722, 726; *United States Fidelity & Guaranty Co.* v. *Barry*, 236 id. 464; affd., 262 N. Y. 471; *Newman* v. *Newman*, 160 App. Div. 331, 335.)

The defendants say that the checks when actually paid are the equivalent of money and the defendants are in the same position as though they had received currency. "But when the recipient of the check has collected the money upon it, he is in precisely the same situation as if he had received the money in the first instance *with such knowledge as to the real ownership* thereof as is

to be imputed to him from the fact appearing on the face of the check." (*Dike* v. *Drexel*, 11 App. Div. 77, 83.)

On June 8, 1928, Horvatt delivered to the defendants a New York draft for $5,941.12, $1,107.08 of which was credited to balance his account in the name of Leo R. Donahue and $4,834.04 of which was credited to balance his account in the name of Elizabeth O'Day. The amount of the diversions thereafter is $760,850.66.

On July 5, 1928, two cashier's checks were credited on his account in the name of Mary B. Donahue. One of them was signed by Horvatt personally. The amount of the diversions thereafter is $751,379.11.

Many other drafts and cashier's checks were remitted to defendants in these accounts subsequent to June 8, 1928.

Upon receipt of the first of these remittances, the defendants were put on inquiry as matter of law and "bound by the information which [they] could have obtained if an inquiry on [their] part had been pushed until the truth had been ascertained." (*Bischoff* v. *Yorkville Bank*, 218 N. Y. 106, 113, 114; *Gilliland* v. *Lincoln-Alliance Bank*, 239 App. Div. 68, 70, 71; affd., 264 N. Y. 517.)

Furthermore, the preponderance of authority is to the effect that the defendants were put on inquiry as a matter of law when the false and fraudulent credits were given them in their deposit account with the bank. On April 17, 1928, such a credit in the sum of $13,500 was set up, $12,500 thereof being credited by defendants to Horvatt's account in the name of Mary B. Donahue and $1,000 thereof being credited by defendants to his account in the name of Elizabeth O'Day. Thus at the outset of the trading the defendants were put on notice. (*Hier* v. *Miller*, 68 Kans. 258; 75 P. 77; 63 L. R. A. 952, 956; *State ex rel. Spillman* v. *Thedford Bank*, 114 Neb. 534; 208 N. W. 627; *Langlois* v. *Gragnon*, 123 La. 453; 49 So. 18; 22 L. R. A. [N. S.] 414; *First National Bank* v. *Rust*, 257 Fed. 29; *Kempner* v. *Citizens Bank*, 64 Ind. App. 632; 116 N. E. 440; *Brooks* v. *Peoples Bank*, 233 N. Y. 87, 96; 4 Michie on Banks, § 117, p. 287.) These cases cite and rely on the principle established in *Claflin* v. *Farmers' & Citizens' Bank* (25 N. Y. 293) and *Bank of N. Y. N. B. Assn.* v. *American Dock & T. Co.* (143 N. Y. 559). We are not unmindful of *American Surety Co.* v. *Bache* (82 S. W. [2d] 181 [Tex. Civ. App.]). It would appear from *Fort Worth Nat. Bank* v. *Harwood* (229 S. W. 487 [Comm. of App. of Tex.]) that the rule requiring inquiry as a matter of law, when an officer pays his individual debt with a corporate check or draft, is not there recognized.

The plaintiff also argues that, aside from the notice given as matter of law by the form of the remittances and credits, the

defendants were also given notice and put upon inquiry as *matter of fact* by all the facts and circumstances established.

The property embezzled consisting of negotiable instruments, the defendants are deemed *prima facie* to be holders in due course, but their embezzlement being established, the burden is on the defendants to prove that they acquired title as holders in due course. (Neg. Inst. Law, § 98; *Canajoharie National Bank* v. *Diefendorf,* 123 N. Y. 191, 206; *Fidelity-International Trust Co.* v. *Canalizo,* 211 App. Div. 325, 327.) Those were actions brought *on* the negotiable instrument. Defendants say that in this action for money had and received, the burden is not on them. We think it is. (*Harter* v. *Peoples Bank of Buffalo,* 221 App. Div. 122, 126; *Pease Piano Co.* v. *Waterloo Organ Co.,* 36 id. 627, 628; *Moak* v. *23rd Ward Bank,* 100 Misc. 488, 491; *Merchants National Bank* v. *Detroit Trust Co.,* 258 Mich. 526; 242 N. W. 739; 85 A. L. R. 350, 355; *Kean* v. *National City Bank,* 294 Fed. 214, 226; review denied, 260 U. S. 729; *Commercial Union Ins. Co.* v. *Connolly,* 183 Minn. 1; 235 N. W. 634, 636; *Morris* v. *Muir,* 111 Misc. 739; affd., 191 App. Div. 947; *Curry* v. *Wisconsin Nat. Bank,* 149 Wis. 413; 136 N. W. 549, 551; *Kittredge* v. *Grannis,* 244 N. Y. 168, 177.) In the last case, an action for money had and received, the court said: " In any event the sale of the bonds * * * was a breach of faith and amounted to a fraud. The purchaser under such circumstances to be protected must show that he received them in due course."

The cases cited by defendants contain some dictum to the contrary but they are not in point. *Seybel* v. *Nat. Currency Bank* (54 N. Y. 288) and *Wiese* v. *Corn Exchange Bank Trust Co.* (240 App. Div. 198) were decided on the merits, not on the question of the burden. *Iselin* v. *Chemical Nat. Bank* (6 App. Div. 532) involved the pleading. The court said (p. 533): " There is no question in respect to the burden of proof, but only as to the facts necessary to be alleged to sustain the cause of action." *Lawyers' Title Insurance & Trust Co.* v. *Jones* (113 App. Div. 105) was an action to recover moneys paid to redeem stolen bonds. The court said (p. 107): " If the plaintiff had sued *for* the bonds, doubtless, on showing title and that they were stolen, it would have been incumbent upon the defendants to give evidence that they were *bona fide* holders for value."

None of defendants' authorities refer to section 98 of the Negotiable Instruments Law. The true owner may recover non-negotiable property even against a holder in good faith and for value. The holder in due course of negotiable instruments (Neg. Inst. Law, § 91) may hold and enforce the same even against the true owner

(§ 96), but when it appears that the holder has taken from one whose title was defective the burden is on the holder to prove that he is a holder in due course, that when he took, he had no notice of any infirmity or defect in the title (§ 98). He has the advantage of being deemed *prima facie* a holder in due course, but over against that he has the burden of showing that he acquired title without notice. Whether the holder brings the action *on* the instrument or is, as here, *defendant* in an action to replevin the same or recover its proceeds, if he claims the advantage of being a holder in due course, he must, when a previous defect in title is shown, assume the burden of proving that he took without notice.

Wherever the burden of proof, we hold as a matter of fact that the knowledge and information possessed by the defendants and the manager of their Binghamton office, when the accounts were opened, were sufficient to put them on notice and under a duty to inquire. (*Kelso & Co.* v. *Ellis*, 224 N. Y. 528, 535; *Rochester & C. T. R. Co.* v. *Paviour*, 164 id. 281, 285; *Lamson* v. *Beard*, 94 Fed. 30; *Ward* v. *City Trust Co.*, 192 N. Y. 61; *Bischoff* v. *Yorkville Bank*, 218 id. 106; *Gilliland* v. *Lincoln-Alliance Bank*, 239 App. Div. 68; *Canajoharie Nat. Bank* v. *Diefendorf*, 123 N. Y. 191; *Heig* v. *Caspary*, 191 App. Div. 560; affd., 232 N. Y. 574; *Arnd* v. *Aylesworth*, 105 Iowa, 185; 29 A. L. R. [N. S.] 638; 123 N. W. 1000.) Closely analogous on the question of notice, duty to inquire, effect of concealment from directors, estoppel and negligence of the directors, is *Lamson* v. *Beard* (*supra*).

When Mr. Horvatt opened the first accounts with defendants and began trading therein, Mr. Malane knew that Horvatt, president of a small bank, had opened and conducted four speculative accounts with Dyer in the names of other persons; that the required written authorizations to do so had not been furnished, except possibly in one instance; that the gross purchases and sales therein, in approximately one year, were nearly ten million; that such trading in the accounts in the names of the manager and bartender in Horvatt's restaurant was nearly eight million; and said accounts had been closed as before related. He also knew that the first transaction of Horvatt with the defendants was a speculative purchase in the bank's account. Within two days he opened three accounts in the names of his relatives, producing no authorizations and almost immediately began speculative trading on an enormous scale. We might mention other facts known at the outset. The facts known were certainly " suspicious circumstances of a substantial character."

The defendants rely upon *First National Bank* v. *Hudson* (166 App. Div. 51; affd., 222 N. Y. 556). There the plaintiff sought to

recover its funds diverted to the defendants' stockbrokers in the course of the cashier's speculations. The cashier used his personal checks. His bank balance was created by fraud. He also diverted some stock. The Appellate Division said (p. 53): " The action was tried and the appeal argued upon the theory  *  *  *  that the defendants had *actual* notice of these facts when the same were received by them." Again (p. 56): " Assuming that the checks *  *  *  were paid with moneys embezzled  *  *  *  the plaintiff could not recover without proving that the defendants had *actual* notice of that fact. That *actual*, as distinguished from constructive notice, was essential  *  *  *  was frankly conceded  *  *  *. Indeed, it could not well be disputed, for if the facts were only such as would put the defendants on inquiry *  *  *  their presentation constituted a sufficient inquiry." These statements are dicta, with which we do not agree. The case was not tried upon the theory of a duty to inquire. In the Court of Appeals it was said: " The case was tried upon the theory that the defendants received these moneys with *actual* notice that they belonged to the bank." It appeared that for many years the bank authorized its cashier to purchase its securities in his personal account and then credited his account in the bank with the purchase price. Such practice was authorized and ratified by the directors. The case is by no means parallel. Curiously, though decided in 1915, it has never been cited.

The defendants also rely on *Central National Bank* v. *White* (139 N. Y. 631), an action commenced in 1869, and tried in the early nineties before a referee, *who found in favor of the defendant.* The Court of Appeals merely held that there was evidence to support the finding, saying by FINCH, J. (p. 636): " Now, I do not say what my own judgment would have been as a referee on these facts."

As to inquiry, the defendants made no inquiry whatever, except by presenting the drafts and cashier's checks, which is later discussed.

Concededly one under the duty of making inquiry is under the burden of proving that the facts which he could have discovered, had he inquired, would have protected him. The presumption being that an agent has no right to use the principal's funds to pay his personal debt, " The purpose of the law in exacting inquiry *  *  *  is to see whether the apparent situation is the actual situation, or in other words to learn whether facts exist to rebut the presumption. The object is not to discover *negative* facts, or such as would not arouse suspicion, but *positive* facts which would allay the suspicion already aroused." (*Ward* v. *City Trust Co.* 192 N. Y. 61, 70.) In other words, the defendants here had the

burden of proving that inquiry would have disclosed that Horvatt was authorized to use bank funds in financing his personal marginal transactions. *Lamson* v. *Beard* (*supra*) is precisely in point.

Where notice is given by the form of the remittance, the inquiry and the only inquiry is whether the agent had authority to issue the instrument and use the corporate funds for his individual obligation. The fact that the agent *had* or subsequently *did reimburse* the principal, is not conclusive on the question of authority. (*Lamson* v. *Beard*, 94 Fed. 30; *Claflin* v. *Farmers' & Citizens' Bank*, 25 N. Y. 293; *Wagner Trading Co.* v. *Battery Park Nat. Bank*, 228 id. 37; *Goshen Nat. Bank* v. *State*, 141 id. 379.) Of course, if the agent had authority to issue or indorse checks for his personal use, the taker is protected.

Of whom should the defendants have inquired? Obviously, not of Horvatt. While " there is no reason to suppose as a matter of law " that the cashiers would have given false answers (*Heig* v. *Caspary*, 191 App. Div. 560, 564), " authority could have come only from the directors, by direct resolution or by acquiescence or implied assent, and the plain, unmistakable course was to push the inquiry, wherever begun, to the source of authority." (*Lamson* v. *Beard, supra*, 40.) " The first inquiry would have called for a resolution of the board of directors authorizing [defaulter] to use the check to pay his own debts." (*Ward* v. *City Trust Co., supra*, 71.) Even general authority to sign checks, notes and other obligations for the principal would give no authority to sign for the personal use of the agent. (Id.) " Such an inquiry involved no difficulty beyond communicating to the directors of the bank * * * the fact that such a draft or drafts had been tendered in discharge of liabilities incurred in dealings * * *. There can be little doubt what would have been the result of such an inquiry, accompanied with a frank and full statement of the facts as they were known to the [defendants] * * *. It would not have needed a discovery of [Horvatt's] fraudulent bookkeeping to enable the directors to say whether the execution of such paper had been theretofore authorized, or then had their approval." (*Lamson* v. *Beard, supra*, 39, 40.)

Implied authority might be found in an extended similar course of dealing *known to or ratified by* the directors or a superior officer. There was no superior officer. There is no proof that any directors, outside of Horvatt, had the slightest information of the remittances to defendants or similar remittances to others or of their payment by the bank. (*Lamson* v. *Beard, supra*, 40, 41; *Campbell* v. *Manufacturers' National Bank*, 67 N. J. Law, 301, 305; 51 A. 497.) We hold and find that Horvatt had no implied authority.

The defendants argue that the presentation of the cashier's checks and drafts was sufficient inquiry. This may be true where the agent or officer presents his principal's checks to a bank for *deposit* to his individual account. " A fiduciary [trustee or agent] may legally deposit the trust funds in a bank to his individual account and credit. Knowledge on the part of the bank of the nature of the funds received and credited does not affect the character of the act. The bank has a right to presume that the fiduciary will apply the funds to their proper purposes under the trust." (*Bischoff* v. *Yorkville Bank*, 218 N. Y. 106, 111.) Even so when it appears to the bank that the fiduciary is paying a personal debt from the trust funds, " it was under the duty to make reasonable inquiry and endeavor to prevent a diversion." (Id. 114.) In *Havana Central R. R. Co.* v. *Knickerbocker Trust Co.* (198 N. Y. 422), cited by defendants, the agent deposited his principal's check in his personal account. The check was presented and collected by his bank. The court distinguished *Ward* v. *City Trust Co.* (*supra*), saying the " check there in controversy was delivered to the defendant in payment of a personal loan." The doctrine of agency relied on in the *Havana Bank* case seems to be questioned in *Whiting* v. *Hudson Trust Co.* (234 N. Y. 394, 404, 405). We think the doctrine that presentation for payment constitutes sufficient inquiry is limited to cases where the agent or trustee *deposits* the check and does not apply where the check is given in payment of his individual debt.

The defendants allege as a defense that the *directors* were negligent. We incline to the view that the negligence of the directors, if any, is not a defense here. There could be no ratification by silence and acquiescence where there was secret fraud, embezzlement and withdrawal of the corporation's funds. (*Wagner Trading Co.* v. *Battery Park Nat. Bank*, 228 N. Y. 37, 43, 46; *Lamson* v. *Beard*, 94 Fed. 30; *Kitchens* v. *Teasdale, etc., Co.*, 105 Mo. App. 463, 469.) Even stockholders may not divert corporate assets as against creditors of the corporation. (*Ward* v. *City Trust Co., supra*, 73.)

Furthermore, it is not shown that the directors were negligent. We hold that they were not. There is no proof that they had any knowledge of Horvatt's speculation, or of his remittances to brokers for that purpose.

The declarations of the Superintendent of Banks in the complaint in an action brought against the directors are not *res gestæ;* they are at most hearsay. They are the statements of a nominal, not the real, party. They are not conclusive, or even admissible. (*Davenport* v. *Walker*, 132 App. Div. 96, 101, 102.)

Finally, the defendants say the plaintiff has failed to prove its damage.

Exhibits VV 1 to 51, consisting of four categories, show the bank assets claimed to have been diverted into the accounts of Mary Donahue, Leo Donahue, Elizabeth O'Day, Andrew J. Horvatt and H. Morrissey, to cover trading losses. (It does not include the DeWitt account which, however, was proven.)

Category 1 shows, as to each account, the liquid assets so diverted, *i. e.*, (1) credits set up in defendants' deposit account in the bank, (2) cashier's checks, (3) New York drafts, (4) Horvatt's personal checks, (5) currency.

Category 2 shows the securities, 132 in all, purchased and paid for in the bank account with Bache, transferred free to one of the individual accounts and sold therein. It traces the transfer of each security from the bank account into the individual account and traces the purchase of each security in the bank account and the payment therefor by the bank.

Category 3 shows the securities purchased and paid for by the bank (mostly by cashier's checks) through other brokers, diverted by Horvatt from the bank into the individual accounts for collateral and sold therein. It shows the purchase of such securities and payment therefor by the bank, through other brokers. It traces the securities to the defendants and shows the sale thereof by the defendants.

The amount claimed in Categories 2 and 3 is the amount received by the defendants when the securities were sold in the individual account, plus dividends received while the securities were held by defendants.

Category 4 shows the cashier's checks, Horvatt's personal checks and one security which were delivered to the defendants into the State Bank account to liquidate losses upon tradings in that account.

Schedule B, *supra*, gives the total assets *delivered* to the defendants. Schedule C, *supra*, states those claimed to have been diverted into the various accounts. In that schedule the diversions are allocated to the several accounts and also analyzed as to the form of the remittance.

To detail the proof of each of the items set out in these categories would be impossible and of no avail. We think the evidence establishes that the currency and each of the cashier's checks, drafts and personal checks were delivered to the defendants and that the securities there listed were delivered free to the defendants in the various accounts and the credits set up in defendants' deposit account as stated. We so hold.

In addition to the items set out in Category 1, it is established that there was delivered into the DeWitt account Horvatt's personal checks to the amount of $3,078.34 and currency in the amount of $1,200, a total of $4,278.34. It is also established that a cashier's check dated November 4, 1929, for $29,150 was remitted to the bank account in payment for 1,000 Niagara Hudson. This stock was sold for $20,466, which amount was remitted, leaving a balance of $8,684 retained by the defendants to cover the loss. This amount is not included in Category 4.

Notwithstanding the delivery to defendants of the items in said Categories 1, 2, 3 and 4 and of the items in the last paragraph above, the defendants argue that the proof does not show that "assets of the State Bank of Binghamton were misappropriated" by Horvatt and delivered to them. This concededly the plaintiff must establish. Defendants say there is no proof of the ownership of the currency; that it does not appear that the bank credits, cashier's checks, drafts and personal checks which make up Categories 1 and 4 or which paid for the securities which make up Categories 2 and 3, were paid from bank assets.

When these forms of remittance were issued or paid, either to defendants or other brokers, various devices were employed to offset or conceal them. Forged notes were placed in the bank. Fictitious charges were made against the commercial account "control," i. e., the figure on the general books purportedly representing the bank's total liability to commercial account depositors. At the time of bank examinations, individual ledger cards of commercial account depositors were removed from the files in order to conceal said fictitious charges to the "control." Fictitious charges were also made to the interest account "control" and interest account ledger cards permanently removed from the files or, in other cases, falsified. These devices were employed indirectly and with variations. For instance, upon the issuance of cashier's checks or drafts, debit slips or personal checks were put in the cash drawer and later replaced by forged notes or the removal or falsification of interest account ledger cards. In other instances personal checks and debit slips were charged against the commercial account "control," adjustments being made in the latter through the introduction of forged notes or the removal of interest cards. Checks from other brokers were also used both to adjust the commercial account "control" and to take up slips in the cash drawer. Horvatt was dealing with several brokers, in his own name, the bank's or others. Remittances came in from securities sold and some for profits made, in those accounts. These remittances from other brokers went into the bank funds. The defendants say such

remittances going into the bank were the property of Horvatt, and that it is not established that his personal checks and the debit slips were not covered by such remittances rather than bank assets. They say the remittances to defendants might have been made out of a " pre-existing credit balance " or the bank later reimbursed. The answer is, taking the testimony as a whole, *there was no pre-existing balance and no reimbursement.*

Let us examine the evidence to determine whether Horvatt ever had a credit balance; whether the remittances from other brokers belonged to him or to the bank; whether when such remittances came into the bank, they met his personal checks or created a credit balance to meet them.

Horvatt organized the bank and, on January 2, 1924, it took over his private bank. At that time about $100,000 had already been stolen from it by Horvatt. The private bank held forged notes to cover this amount. On March 20, 1928, when Horvatt's trading with and through the defendants began, there was a shortage exceeding $600,000 concealed by falsification of deposit cards and forged notes. When the State Bank closed December 15, 1930, the shortage was over $2,000,000; $484,558 thereof was concealed by forged notes; $1,000,978.96 by the removal from the active files of interest account ledger cards; $196,533.05 by falsification of interest ledger cards, and $361,729.53 by falsification of commercial ledger cards. What happened to the bank was well expressed by defendants' counsel in his opening when he said: " Here is a loss to this bank of something like $2,000,000. This man Horvatt began stealing back in 1920 or 1921, according to the undisputed evidence." As is also well stated in defendants' brief: " The evidence shows that the accounts of the bank were never in balance; its books were falsified; sums of money were arbitrarily transferred from interest deposit accounts to commercial account ledger cards; depositors' ledger cards were extracted from so-called ' active files ' for the purpose of creating forced balances for examinations; every other conceivable irregularity was practiced." Horvatt at no time had a deposit account in the bank except some small special accounts of his insurance and other business, to which none of these items were charged, and a memoranda account on a " dumbwaiter " card referred to later.

The facts established and the only reasonable inference to be drawn from the testimony show that Horvatt, during all the period of his trading with the defendants, had no credit balance in the plaintiff bank, no deposit, no assets of any nature against which to draw a check or a debit slip, or with which to pay for a

cashier's check or a draft. On the contrary, he was, during all this period, the debtor of the bank upon his defalcations. If the books had been honestly kept, he would have had a large and constantly increasing overdraft. Can a cashier's check, a draft or a loan of currency be paid for by a check against an overdraft?

If there is no direct testimony that the currency remitted to defendants belonged to the bank, every fair inference indicates that it did.

It probably is not possible, in view of the manner in which the bank's records were kept, or rather not kept, to show *by them* that Horvatt did not have a credit balance to meet each personal check or debit slip as given. However, Horvatt testified as to the remittances to defendants and other brokers that they were not charged against any account in the bank, that when credits to defendants were set up on the latter's deposit account, no corresponding charge was made to any other account, that the bank received nothing for the credits set up in the defendants' deposit account or for the currency, cashier's checks, drafts or personal checks delivered to the defendants. *This testimony is corroborated by the evidence and every reasonable inference to be drawn therefrom.*

If Horvatt had a credit balance at any time, there most certainly was no occasion for failing to show it in the active files. The funds of the bank were all he had to use. Defendants say the vast sums of money sent out to and returned by brokers created a " gigantic revolving fund." We would say that all the assets of the bank were used as a gigantic revolving fund and that by each revolution there was a substantial loss erosion, with an occasional profit accretion, never, however, sufficient to make up for past erosions.

The defendants argue that the plaintiff has not proven that the funds which came in, or rather came back, from other brokers, did not create a credit balance against which Horvatt's personal checks were drawn. We think it has. Horvatt's shortage, embezzlement, overdraft, whatever it be called, over $600,000 when he began trading with defendants and constantly increasing, was never wiped out by these incoming remittances, or otherwise. No credit balance was ever established. If the incoming remittances' were Horvatt's, they only served to reduce his shortage, not to create a credit balance.

Furthermore, the incoming remittances from other brokers belonged to the bank, not Horvatt. They were traced to transactions with the other brokers which were financed by cashier's checks, drafts and Horvatt's personal checks on plaintiff bank, similar to the transactions with the defendants. In other words, they were financed by the plaintiff bank. Indeed, many of these

incoming remittances, including the remittances from Vilas & Hickey for the profit in the National City securities, were payable, not to Horvatt, but to the bank or its New York depository, the Irving Trust Company. The transaction having been financed with the bank's converted assets, the proceeds of the transaction belonged to the bank, not to Horvatt. The bank could elect to take the substituted property and thereupon the title thereto vested in the bank. (*Matter of Cavin* v. *Gleason*, 105 N. Y. 256, 260; *Newton* v. *Porter*, 69 id. 133, 137.) The defendants, too, remitted some funds out of Horvatt's various accounts. Like the remittances from other brokers, they represented funds returned to the bank in reduction of Horvatt's shortage caused by previous embezzlements.

Even if the proceeds of some transactions belonged to Horvatt, when he deposited them in the bank, the title became vested in the bank. In *Cohnfeld* v. *Tanenbaum* (176 N. Y. 126, 131) the court said: " But if we assume that the guardian had embezzled the money, the obligation existed to make restitution and his subsequent deposits *from whatever sources received* would be an appropriation of those moneys in satisfaction of his ward's claim against him. From such time they became the infant's moneys as against every one except one who claiming the moneys could show they had been wrongfully diverted."

The plaintiff's testimony was to the effect that these remittances from other brokers were not credited to any account. The defendants argue that some of them at least were credited to Horvatt. Some of them were entered on the so-called dumbwaiter cards, *i. e.*, ledger cards found in a dumbwaiter after the bank closed. It appears from the testimony of Messrs. Horvatt, Mottram and Polosky that some memoranda was kept to show the shortage in order that it might be compensated by forged notes or falsification or removal of ledger deposit cards. It is testified that Polosky, the bookkeeper, kept in his pocket a list of the checks fraudulently drawn; that on these dumbwaiter cards there was kept a memoranda of remittances in and out and that by use of this memoranda Polosky determined, approximately at least, the amount of the shortage to be covered. True, the place or places where such cards and memoranda were found does not of itself show that they were irregular or false accounts, but it corroborates the testimony to the effect that they were mere memoranda of partial restorations. A very few of the cards look regular; most of them bear no name; some bear a fictitious name. We hold that these ledger cards did not represent actual credits and debits or regular accounts.

As to the securities diverted to defendants (Categories 2 and 3), we have pointed out that these were paid for with bank funds, whether purchased through defendants or other brokers. Those purchased through defendants were not only bought with bank funds but in the bank's account. Defendants question some items. Space forbids a detailed tracing of each item. To mention a few: Goldman Sachs was delivered free to the defendants; National Bellas Hess was delivered to the defendants as a stock dividend; Julius Kayser stock represented the conversion of its bonds owned by the bank. Title to this stock does not seem to have been questioned. On their motion for nonsuit, the defendants moved as to all items " other than the value or proceeds of sale of * * * 160 Julius Kayser * * * being stock received on the conversion of bonds held in the bank's portfolio." The 500 St. Regis were bought and paid for in the bank account and shipped to Binghamton but immediately returned to New York and sold. The proceeds were retained and, with a cashier's check, balanced the bank account losses. We fail to see why the retention of the proceeds to cover losses is any less a conversion than the acceptance of a remittance for the same purpose.

We hold that the plaintiff has established its damage as alleged and set forth in Exhibit VV and also the additional items in the DeWitt account and the $8,684, referred to heretofore.

The plaintiff may recover in this action for money had and received. It is not seeking or required to trace the assets or impress a trust, as in the usual case against an insolvent debtor, but to enforce a personal liability. We have said that the plaintiff took title to the securities purchased with its diverted funds and the proceeds thereof. Even if it took only an equitable title or interest, it may recover in this action for money had and received. (*Roberts* v. *Ely*, 113 N. Y. 128, 131; *Miller* v. *Schloss*, 218 id. 400, 407.)

We find that all the assets listed in Exhibits VV 1 to 50 were the assets of the State Bank and were diverted to and received by the defendants, as were also the $4,278.34 diverted into Horvatt's account in the name of DeWitt and the $8,684 diverted into the bank account, neither of which is shown on said exhibits.

The defendants from time to time remitted moneys from the Horvatt accounts in question by checks or drafts payable to the respective parties in whose names the accounts stood, namely, Mary B. Donahue, Elizabeth O'Day, Leo R. Donahue, Andrew J. Horvatt and one to M. Blasko. These remittances went into the bank assets. Although such remittances merely reduced Horvatt's gross shortage, we think the defendants are entitled to credit therefor. The gross amount thereof was $386,125.06.

As heretofore found, the gross diversion by Horvatt to the defendants, as set out in Exhibit VV, plus $4,278.34 diverted into the DeWitt account and $8,684 from the cashier's check given in payment of the Niagara Hudson stock, is $824,350.66. Crediting the total remittances of $386,125.06 leaves a net diversion of $438,225.60.

The gross diversion after June 8, 1928, the date when notice was given by the form of the instrument, *i. e.*, the draft of that date, was $760,850.66. The remittance by defendants after such date of $364,932.47, leaves a net diversion thereafter of $395,918.19.

The gross diversion after July 5, 1928, the date when notice was given by the form of the instrument, *i. e.*, by two cashier's checks, one signed by Horvatt personally, was $751,379.11. The remittance by defendants after such date of $364,932.47 leaves a net diversion thereafter of $386,446.64.

Holding as we do that the defendants were put on notice when the accounts were opened and the diversion of plaintiff's assets to the defendants began, we hold that the plaintiff is entitled to recover in the three actions the said sum of $438,225.60 as follows:

In Action No. 1, $152,625.77, with interest from March 31, 1929.

In Action No. 2, $180,813.14, with interest from December 31, 1929.

In Action No. 3, $104,786.69, with interest from December 15, 1930.

The plaintiff's motions for judgment in each action are granted and judgments may be entered for the amounts above found with costs in each action against all the defendants.

Upon the trial decision was reserved upon certain motions. It remains to pass upon these.

The plaintiff's motion to strike from the answers the allegation of the negligence of the directors, as a defense, is denied.

The defendant's motion to strike out the evidence of Messrs. Mottram and Abbihl as to statements of Charles W. Allen relative to the discontinuance of the defendants' deposit account with the plaintiff, is granted. Though admissible against Allen personally, we have not considered it.

The defendants' motion to strike out Exhibits UU 17 to 27 and Exhibit VVV is denied. However, they are not received or considered on the question of notice to Mr. Malane or the defendants, he having testified that he did not look at them. The information therein contained and the oral testimony relating thereto is considered for the purpose of comparison.

The defendants' motion to strike out the proof of the approximate deposits of the three principal banks of Binghamton is denied. They were received for the purposes of comparison.

The defendants' motion to strike out Exhibit OOOO — a page of the Rand, McNally Bankers' Directory — is granted.

The defendants' motion to strike out Horvatt's testimony that Malane introduced him as Blasko is denied. It bears upon Malane's knowledge and information even before trading with defendants began.

The defendants' motion to strike out the evidence of Mr. Mitchell, as to his conversation with Malane with reference to the Horvatt-Dyer accounts and their closing, is denied. It is not considered as an admission by Malane which would be binding on defendants but has bearing upon Malane's knowledge even before trading with defendants began.

The defendants' motion to strike out Exhibit C, being excerpts from the constitution and rules of the New York Stock Exchange, is granted, except as to the rule providing for interest where settlement with customers is made prior or subsequent to date of settlement.

The defendants' motion to strike out certain evidence of Messrs. McDonald, Coddington and Furry is denied, comparisons of their transactions with banks other than the plaintiff having been brought into the actions.

The plaintiff's motion to strike out the evidence of Mr. Mottram introduced by defendants on the question of the negligence of the directors and Exhibits DAM 1 to 11, being the reports of the examiners of State Bank by directors' examining committee, is denied.

The plaintiff's motion to strike out Exhibits DG 1 through 11, DH 1 through 11, and DL 1 through 5, is denied.

The motions on behalf of Ruby Kann, as executrix, are denied.

The motion of the defendants at the close of the plaintiff's case for a nonsuit and a dismissal of the complaints is denied.

The motion of the defendants at the close of all the evidence for a dismissal of the complaints is denied.